**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KADJA JARRETT, | ) | CASE NO. 1:18CV2229 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Kadja Jarrett ("Plaintiff" or "Jarrett"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42

U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I. PROCEDURAL HISTORY

In January 2014, Jarrett filed applications for POD, DIB, and SSI**,** alleging a disability onset date of September 30, 2011[2] and claiming she was disabled due to lupus, fibromyalgia, depression, high blood pressure, chronic obstructive pulmonary disease, and hypothyroidism. (Transcript ("Tr.") at 369-371, 395.)  The applications were denied initially and upon reconsideration, and Jarrett requested a hearing before an administrative law judge ("ALJ").  (Tr. 260, 263, 270, 277, 282.)

On December 9, 2015, an ALJ held a hearing, during which Jarrett, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 111.)  On March 24, 2016, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 223.)  Jarrett sought review of this decision by the Appeal Council, which remanded the case to an ALJ for further proceedings.  (Tr. 253.)

On November 1, 2017, an ALJ held a hearing, during which Jarrett, represented by counsel, and an impartial VE testified.  (Tr. 54.)  On December 5, 2017, the ALJ issued a written decision, again finding Jarrett was not disabled.  (Tr. 12.)  The ALJ's decision became final on July 30, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On September 27, 2018, Jarrett filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)  Jarrett asserts the following assignments of error:

    (1)      Whether the ALJ erred in giving limited weight to the opinions of Ms. Jarrett's treating physician and psychiatrist.

---

[2]     Jarrett later amended this onset date to January 15, 2014.  (Tr. 16.)

(2)     Whether the ALJ properly evaluated Ms. Jarrett's pain.

(Doc. No. 14.)

## II.     EVIDENCE

**A.     Personal and Vocational Evidence**

Jarrett was born in January 1972 and was forty five years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 44.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a medical assistant.  (*Id.*)

**B.     Relevant Medical Evidence[3]**

**1.     Mental Impairments**

On October 6, 2014, Jarrett presented to the emergency room after expressing suicidal thoughts to her rheumatologist.  (Tr. 1073.)  She reported hearing voices and a desire to harm several people in her life.  (*Id.*)  Jarrett's urine screen was positive for marijuana.  (Tr. 1076.)  Jarrett's mood eventually improved during her emergency room visit and she was told to obtain outpatient treatment.  (Tr. 1078.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. The Court further notes that both the Jarrett and the Commissioner have cited generally to large swaths of evidence in their Briefs.  (Doc. No. 16 at 4; Doc. No. 14 at 13.)  This does not comply with the Court's Order, which provides that the brief "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue.  (Doc. No. 4 at 3.)  Thus, the Court discusses only that evidence which has been cited by the parties with specificity, as required by this Court's Order.

On February 17, 2015, primary care physician Anil R. Pai, M.D., completed a form captioned "Medical Source Statement: Patient's Mental Capacity" on behalf of Jarrett. (Tr. 1081-1082.) Dr. Pai opined Jarrett could frequently:

- follow work rules;

- deal with the public;

- understand, remember, and carry out simple job instructions;

- maintain appearance; and

- leave her home independently.

(*Id.*) Dr. Pai found Jarrett could occasionally:

- use judgment;

- maintain attention and concentration for extended periods;

- respond appropriately to changes in routine settings;

- maintain regular attendance and be punctual within customary tolerance;

- relate to co-workers;

- interact with supervisors;

- function independently with redirection;

- work in coordination with or proximity to others without being distracted or being distracting;

- complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;

- understand, remember, and carry out detailed and complex job instructions;

- socialize and behave in an emotionally stable manner;

- relate predictably in social situations; and

- manage funds/schedules.

(*Id.*)  Dr. Pai concluded Jarrett could rarely deal with work stress.  (Tr. 1081.)

On October 13, 2015, Dr. Pai completed another "Medical Source Statement: Patient's Mental Capacity" form on behalf of Jarrett.  (Tr. 1400-1401.)  Dr. Pai opined Jarrett could frequently perform the following:

- follow work rules;

- use judgment;

- understand, remember, and carry out simple job instructions; and

- leave home independently.

(*Id.*)  Dr. Pai found Jarrett could occasionally:

- maintain attention and concentration for extended periods;

- respond appropriately to changes in routine settings;

- deal with the public;

- relate to co-workers;

- interact with supervisors;

- function independently without redirection;

- understand, remember, and carry out detailed and complex job instructions;

- maintain appearance;

- socialize and relate predictably in social situations; and

- manage funds and schedules.

(*Id.*)  Dr. Pai concluded Jarrett could rarely:

- maintain regular attendance and be punctual within customary tolerances;

- work in coordination with or proximity to others without being distracted or distracting;

- deal with work stress;

- complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and

- behave in an emotionally stable manner.

(*Id.*)

On December 15, 2015, Jarrett visited psychiatrist Jennifer Brandstetter, M.D., for depression.  (Tr. 1620.)  She reported things were "not going well" and described helplessness and poor sleep.  (*Id.*)  She indicated she would spend entire days in bed and expressed high levels of anger.  (*Id.*)  Upon examination, Jarrett had a distressed affect and depressed mood. (Tr. 1623.)  She denied any auditory or visual hallucinations and her memory and attention were intact.  (Tr. 1623.)  Her insight and judgment were fair.  (*Id.*)  She had passive, but not active, suicidal ideation.  (Tr. 1624.)  Dr. Brandstetter increased Jarrett's medication dosages and referred her to therapy.  (*Id.*)

Jarrett returned to Dr. Brandstetter on February 2, 2016.  (Tr. 1796.)  She indicated she was sleeping better and no longer had suicidal ideation.  (*Id.*)  She continued to have anger and low motivation.  (*Id.*)  Dr. Brandstetter observed Jarrett appeared calmer, despite being under stress.  (*Id.*)  On examination, Jarrett made fair eye contact, had a linear thought process, and intact attention and memory.  (Tr. 1800.)  She denied any suicidal ideation or hallucinations, but

her mood was depressed.  (*Id.*)  Dr. Brandstetter concluded Jarrett had made some improvement because she no longer endorsed passive suicidal ideation.  (Tr. 1801.)

Jarrett saw Dr. Brandstetter again on April 12, 2016, reporting worsening anxiety and mood.  (Tr. 1602.)  On examination, Jarrett was tearful, with a depressed mood.  (Tr. 1606.)  She denied any hallucinations or suicidal ideation and her memory and attention were intact.  (*Id.*)  Dr. Brandstetter adjusted Jarrett's medications and referred her to therapy.  (*Id.*)

On May 27, 2016, Jarrett visited Dr. Brandstetter, reporting she had stopped taking one of her medications, and since restarting this medication, she felt better.  (Tr. 1594.)  She described frustration with her husband and "dark thoughts" when angered.  (*Id.*)  On examination, Jarrett displayed improved eye contact, but a depressed mood.  (Tr. 1597.)  She had no suicidal ideation or hallucinations, and her attention and memory were intact.  (*Id.*)  Her insight and judgment were fair.  (*Id.*)  Dr. Brandstetter adjusted  Jarrett's medications.  (Tr. 1600.)

On June 21, 2016, Jarrett indicated she "didn't notice much change" from her medication adjustment.  (Tr. 1777.)  She reported increased pain because she was doing more around the house.  (*Id.*)  On examination, Jarrett's eye contact was improved and her attention and memory were intact.  (Tr. 1780.)  She denied suicidal ideation and hallucinations, but she reported she was "just existing."  (*Id.*)

Jarrett reported increased panic attacks on July 19, 2016.  (Tr. 1770.)  She described poor sleep and irritability.  (*Id.*)  She admitted she had not followed up with a therapist, but expressed interest in a chronic pain rehabilitation program.  (*Id.*)  On examination, Jarrett had "decent" eye contact, no suicidal ideation, and a linear thought process.  (Tr. 1773.)  Her memory and

attention were intact and her insight and judgment were fair. (*Id.*) Jarrett denied any improvement in symptoms so Dr. Brandstetter adjusted her medications again. (Tr. 1775-1776.)

On August 16, 2016, Jarrett remained overwhelmed, emotional, and easily upset. (Tr. 1575.) She reported continued anxiety and panic attacks, but denied suicidal ideation. (*Id.*) On examination, Jarrett displayed a "dramatic tone" in her voice, with an angry, but controlled, affect. (Tr. 1578.) Her attention and memory were intact and her judgment and insight were fair. (*Id.*) Dr. Brandstetter renewed Jarrett's medications and referred her to urgent care due to elevated blood pressure. (Tr. 1581.)

Jarrett told Dr. Brandstetter on September 6, 2016 that "things are ok[ay.]" (Tr. 1568.) She reported she was limiting her social interactions and Dr. Brandstetter suggested she attend therapy. (*Id.*) On examination, her speech was normal, she had no suicidal ideation, no hallucinations, and intact memory and attention. (Tr. 1571.) Dr. Brandstetter observed Jarrett had made some "limited improvement" in her mood and sleep. (Tr. 1573.) She again referred Jarrett to therapy. (Tr. 1574.)

Jarrett returned to Dr. Brandstetter on May 9, 2017. (Tr. 1561.) She admitted discontinuing one of her medications in February. (*Id.*) She described feeling overwhelmed and socially isolated, with shifting moods. (*Id.*) Jarrett rated her symptoms as "moderate" at that time. (*Id.*) On examination, she displayed no suicidal ideation, no hallucinations, with intact attention and memory. (Tr. 1564.) Her insight and judgment were fair. (*Id.*) Dr. Brandstetter observed "limited improvement in mood/sleep" and referred Jarrett to therapy. (Tr. 1566, 1567.)

On September 5, 2017, Jarrett returned to Dr. Brandstetter, reporting she had ran out of one of her medications a few days ago and was experiencing increased symptoms. (Tr. 1742.)

8

She indicated she continued to socially isolate herself and had not sought out therapy. (*Id.*) Jarrett rated her symptoms as "moderate-severe." (*Id.*) On examination, Jarrett had no suicidal ideation, no hallucinations, intact attention and memory, and fair judgment and insight. (Tr. 1746.)

That same date, Dr. Brandstetter completed a form captioned "Medical Source Statement - Mental Capacity" on behalf of Jarrett. (Tr. 1738.) Dr. Brandstetter found Jarrett had no limitations in the following areas:

- understanding and learning terms, instructions, or procedures;

- following 1 or 2-step oral instructions;

- describing work activity to someone else;

- asking and answering questions and providing explanations;

- recognizing a mistake and correcting it;

- identifying and solving problems;

- sequencing multi-step activities;

- using reason and judgment to make work-related decisions;

- maintaining personal hygiene and attire appropriate to a work setting; and

- being aware of normal hazards and taking appropriate precautions.

(Tr. 1738-1739.) Dr. Brandstetter opined Jarrett was mildly limited in the following areas:

- initiating and performing a task she understands and knows how to do;

- distinguishing between acceptable and unacceptable work performance; and

- making plans for oneself independent of others.

(*Id*.) Dr. Brandstetter found Jarrett was moderately impaired in the following areas:

- asking for help when needed;

- stating her own point of view;

- initiating or sustaining conversation;

- understanding and responding to social cutes;

- responding to requests, suggestions, criticism, correction, and challenges;

- changing activities or work settings without being disruptive;

- working closely to or with others without interrupting or distracting them;

- responding to demands;

- adapting to changes; and

- setting realistic goals.

(*Id*.) Dr. Brandstetter found Jarrett had marked limitations in the following areas:

- cooperating with others;

- handling conflicts with others;

- keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness;

- working at an appropriate and consistent pace;

- completing tasks in a timely manner;

- ignoring or avoiding distractions while working; and

- working a full day without needing more than the allotted number or length of rest periods during the day.

(*Id*.)  Finally, Dr. Brandstetter determined Jarrett had extreme limitations in sustaining an ordinary routine and regular attendance at work and managing her psychologically based symptoms.  (Tr. 1739.)  Dr. Brandstetter provided the following commentary at the bottom of the form:

> Post Traumatic Stress Disorder, Major Depressive Disorder, Recurrent, panic disorder.  Currently mood and anxiety are at a severe level and would impact patient's ability to concentrate on work and interfere in interactions with others.  She would not be able to maintain a schedule to routinely attend work.

(*Id*.)

### 2.      Physical Impairments

A June 2, 2009 lumbar spine x-ray revealed mild disc narrowing at L4-5.  (Tr. 558.) Jarrett subsequently attended physical therapy in June and July 2009.  (Tr. 633, 630.)  By July 20, 2009, she had "no symptoms."  (Tr. 630.)

Jarrett visited her primary care physician, Anil R. Pai, M.D., on June 1, 2012.  (Tr. 509.) She reported a diagnosis of lupus, with skin hypersensitivity and joint aches.  (*Id*.)  On examination, Jarrett had no deformity or tenderness in her joints or spine.  (Tr. 510.)  She had a full range of motion.  (*Id*.)  Dr. Pai ordered updated labwork.  (*Id*.)

On August 16, 2012, Jarrett reported hair loss to Dr. Pai.  (Tr. 512.)  She was feeling "a little better" since starting an iron supplement.  (*Id*.)  On examination, Jarrett had minimal hair thinning.  (Tr. 513.)  She had no muscle weakness, or joint swelling.  (*Id.*)  Jarrett reported pain radiating down her right leg.  (*Id*.)  An August 24, 2012 MRI revealed the following: (1) a large central disc protrusion at L5 with severe right foraminal stenosis and moderate left foraminal

stenosis; (2) disc protrusions at L4 and L3 with mild canal stenosis; and (3) osteoarthritis of the facet joints.  (Tr. 1116.)

Following this MRI, Jarrett was scheduled for back surgery.  (Tr. 515.)  She underwent a right L4-5 hemilaminotomy with discectomy on November 5, 2012.  (Tr. 585.)

On January 16, 2013, Jarrett first visited rheumatologist Padmapriya Sivaraman, M.D. (Tr. 735.)  She described diffuse arthralgias in her hands, knees, wrists, shoulders, and ankles. (*Id.*)  She described intermittent episodes of joint swelling and shortness of breath.  (*Id.*)  On examination, Jarrett had diffuse alopecia and synovitis in her hands and right wrist, without any evidence of joint effusion.  (Tr. 736.)  She had limited internal and external rotation in her shoulders, but her hips, knees, and ankles revealed no evidence of acute joint swelling, erythema, synovitis, warmth, or joint effusion.  (*Id.*)  Dr. Sivaraman concluded Jarrett was experiencing a "mild flare of lupus" and prescribed Plaquenil and steroids.  (*Id.*)

From June 4 through June 7, 2013, Jarrett was hospitalized for chest pain and nausea. (Tr. 577.)  Testing ruled out a pulmonary embolism and her cardiac workup was negative.  (Tr. 578, 581.)  Labwork confirmed "profound hypothyroidism," likely "secondary to her poor compliance" and severe vomiting.  (Tr. 578.)  The hospital physicians attributed her vomiting to her chronic marijuana abuse.  (*Id.*)  Jarrett was discharged in stable condition and told to follow up with an endocrinologist.  (*Id.*)

Jarrett visited Dr. Pai on September 10, 2013, indicating she felt a "little better" overall. (Tr. 520.)  Dr. Pai noted her TSH levels had normalized, but she had a severe iron deficiency. (*Id.*)  Dr. Pai prescribed an IV iron infusion.  (Tr. 522.)  He provided her with Advair for her complaints of wheezing.  (*Id.*)

12

On October 2, 2013, Jarrett visited the emergency room for chest pain and shortness of breath. (Tr. 681.) On examination, she had tenderness in her neck, but a normal range of motion. (Tr. 683.) Her respiratory examination was normal. (*Id.*) Her chest CT scan was negative for pulmonary embolism and her cervical spine x-ray was normal. (Tr. 684.) The emergency room physicians provided her with Valium and Toradol and her condition improved. (*Id.*)

Jarrett returned to Dr. Sivaraman on January 7, 2014, reporting an "overall improvement with lupus symptoms." (Tr. 708.) Dr. Sivaraman noted Jarrett's increased Gabapentin dosage was helping with her fibromyalgia symptoms. (*Id.*) On examination, Jarrett displayed no active joint swelling or synovitis. (Tr. 711.) Dr. Sivaraman listed Jarrett's lupus as stable. (Tr. 715.) On April 8, 2014, Jarrett reported worsening numbness and tingling in her right leg to Dr. Sivaraman. (Tr. 886.) On examination, she had no active joint swelling or synovitis. (Tr. 889.) She had diffuse myofascial tenderness to palpation all over her body. (*Id.*) Dr. Sivaraman ordered a lumbar spine MRI. (*Id.*)

Jarrett saw Dr. Sivaraman again on April 25, 2014, reporting chest pain, shortness of breath, and lower extremity swelling. (Tr. 802.) Jarrett indicated a recent chest x-ray was normal and the Lasix she was taking for the swelling was helpful. (*Id.*) On examination, she had diffuse myofascial tenderness to palpation, along with pitting edema in her ankles. (Tr. 805.) Dr. Sivaraman ordered a CT chest scan, which revealed no evidence of a pulmonary embolism. (Tr. 807, 868.)

On May 7, 2014, Jarrett presented to the emergency room, reporting abdominal pain and persistent vomiting. (Tr. 653.) She reported an endoscopy had revealed a hiatal hernia and

reflux.  (*Id.*)  She also admitted to smoking marijuana on a frequent basis.  (*Id.*)  An abdomen ultrasound was negative.  (Tr. 657.)  Jarrett's condition improved while she was in the emergency room and she was discharged with Zofran and instructions to discontinue smoking marijuana.  (*Id.*)

Jarrett returned to Dr. Sivaraman on May 12, 2014, with diffuse arthralgias and myalgias, along with numbness and tingling in her right leg.  (Tr. 872.)  On examination, she had no active joint swelling or synovitis, but did have diffuse myofascial tenderness to palpation.  (Tr. 875.)  She displayed no neurological deficits.  (*Id.*)

On May 15, 2014, Dr. Pai completed a form captioned "Medical Source Statement: Patient's Physical Capacity" on behalf of Jarrett.  (Tr. 822-823.)  Dr. Pai found the following limitations for Jarrett:

- she can lift and carry five pounds both occasionally and frequently;

- she can stand/walk for one hour total in an 8-hour workday;

- she can sit for 6 hours in an 8-hour workday and 65 minutes without interruption;

- she can occasionally climb;

- she can rarely balance, stoop, crouch, kneel, and crawl;

- she can frequently reach and perform fine manipulation;

- she can occasionally push/pull and perform gross manipulation;

- she is restricted from heights and moving machinery;

- she is not restricted from temperature extremes, pulmonary irritants, and noise;

- she has been prescribed a cane and a TENs unit;

- she requires a position that allows her to alternate between sitting, standing, and walking at will;

- she has severe levels of pain, which interferes with her ability to concentrate, remain on task, and maintain attendance;

- she does not need to elevate her legs; and

- she requires additional unscheduled 30-minute breaks.

(Tr. 822-823.)

A May 29, 2014 lumbar MRI was "stable to improved" when compared to an August 2012 MRI. (Tr. 963.) It confirmed the following (1) a disc herniation at L3-4; (2) post-operative changes at L4-5 along with persisting bilateral recess deformity with involvement of the right L5 root sleeve; (3) a decrease in the disc deformity at L5-S1; and (4) no change in the right neural foraminal stenosis due to posterior osteophytic ridging and disc bulging. (*Id*.)

On June 16, 2014, Jarrett visited the emergency room for a shoulder sprain and abdominal pain. (Tr. 644, 645.) Her abdomen was normal on examination and an x-ray of her left shoulder was negative. (Tr. 648, 650.) A CT scan of her abdomen revealed a non-obstructive gas bowel pattern and a calcific density in the right lower quadrant. (Tr. 651.)

Jarrett saw Dr. Sivaraman on July 7, 2014 for a routine rheumatology follow-up visit. (Tr. 864.) She reported diffuse arthralgias and left shoulder pain, with difficulty raising her arm, dressing and bathing. (*Id*.) Jarrett also described intermittent episodes of blurred vision, but relayed her opthalamologist could find no explanation for this symptom. (*Id*.) On examination, she had limited external rotation and abduction in her left shoulder, but no swelling. (Tr. 867) The remainder of her joints were normal. (*Id.*) Dr. Sivaraman injected Jarrett's left shoulder with Lidocaine and Kenolog and increased her Gabapentin dosage. (Tr. 870-871.)

On August 13, 2014, Jarrett had an occupational therapy evaluation for her left shoulder pain. (Tr. 610.) She explained her left shoulder began to hurt in early July 2014, after she bumped her shoulder on a water park slide. (*Id.*) She also reported 2-3 falls in the past month because of dizziness and knee pain. (*Id.*) On examination, Jarrett had decreased strength in her left shoulder and normal strength in the right. (Tr. 611.) Her sensation was normal. (*Id.*)

Jarrett continued to attend occupational therapy in August and September 2014. (Tr. 1134, 1136, 1144, 1146.) By August 20, 2014, her shoulder pain was gradually decreasing. (Tr. 1136.) In early September, Jarrett reported she had not been able to do her exercises because her lupus and fibromyalgia had flared. (Tr. 1142.) Jarrett's last therapy visit was on September 17, 2014. (Tr. 1146.) She was "feeling bad all over," but indicated her TENS unit provided some relief. (*Id.*) She displayed slightly decreased strength in her shoulder on examination. (*Id.*) Her therapist concluded Jarrett had "plateaued and although her range of motion and strength have increased, her pain continues to persist." (Tr. 1147.) Jarrett was thereafter discharged from therapy with a home exercise program. (*Id.*)

An October 27, 2014 MRI of the left shoulder revealed (1) moderate acromioclavicular joint arthrosis with marrow and soft tissue edema; (2) mild degenerative changes in the glenohumeral joint; and (3) no rotator cuff pathology. (Tr. 1124.)

On December 9, 2014, Jarrett first visited neurologist Deborah Blades, M.D. (Tr. 1119.) She reported generalized stiffness, lower back pain, and severe bouts of depression. (*Id.*) On examination, Jarrett appeared depressed, with normal attention and concentration. (Tr. 1120.) She had decreased range of motion, skin dryness, and a slow and guarded gait. (Tr. 1120, 1121.) Her posture was normal. (Tr. 1121.) The strength in her arms and legs was also normal. (*Id.*)

Dr. Blades referred Jarrett to aquatic therapy, a psychologist, and an orthopedist for her left shoulder. (Tr. 1122.)

Jarrett visited the emergency room on December 16, 2014, reporting chest, back, and neck pain after being jostled in a vehicle. (Tr. 1444.) On examination, she had pain to palpation in neck, right lower ribs, and shoulder. (Tr. 1445, 1446.) Her neurological examination was normal. (Tr. 1446.) Her rib x-ray was negative and a CT of her neck indicated mild degenerative changes with possible disc bulging. (Tr. 1446, 1451.) A left shoulder x-ray confirmed acromiaclavicular joint arthrosis, but a maintained glenohumeral joint with no acute findings. (Tr. 1125.) She was discharged with a soft collar for her neck. (Tr. 1445, 1446.)

Jarrett returned to Dr. Pai on February 6, 2015. (Tr. 1168.) She was wheezing on examination, but her breathing was not labored. (Tr. 1169.) She had muscular tenderness and her left shoulder movements were markedly restricted. (*Id*.) Jarrett reported feeling forgetful, which Dr. Pai attributed to depression and stress. (*Id*.)

On February 17, 2015, Dr. Pai completed a form captioned "Medical Source Statement: Patient's Physical Capacity" on behalf of Jarrett. (Tr. 1083-1084.) Dr. Pai found the following limitations for Jarrett:

- She can lift and carry less than five pounds both occasionally and frequently;

- She can stand/walk for one hour in an 8-hour workday;

- She has no sitting restrictions;

- She can rarely climb, balance, stoop, crouch, kneel, and crawl;

- She can occasionally reach and perform fine and gross manipulation;

- She can rarely push and pull;

- She requires the ability to alternate positions between sitting, standing, and walking;

- She is restricted from heights and moving machinery;

- She experiences severe levels of pain, which interferes with her ability to concentration, remain on task, and maintain attendance; and

- She requires additional unscheduled breaks during the workday, totaling 1-2 hours a day.

(Tr. 1083-1084.)

On March 12, 2015, Jarrett underwent an arthroscopic labral debridement and subacromial decompression of the left shoulder. (Tr. 1226.)

A March 16, 2015 x-ray of the lumbar spine revealed (1) moderate discogenic degenerative changes at L5-S1; (2) mild disc space narrowing at L4-5; and (3) no visual acute fractures or subluxations. (Tr. 1333.)

On April 27, 2015, Jarrett underwent a physical therapy evaluation. (Tr. 1381.) She reported left shoulder and neck pain. (*Id.*) On examination, she had rounded shoulders, increased lumbar lordosis, and ambulated with a normal gait. (*Id.*) Her cervical and upper extremity ranges of motion were within normal limits, with the exception of bilateral cervical rotation and side bending. (*Id.*) Jarrett had full strength in her upper extremities, beyond slightly decreased strength in her cervical extension, cervical rotation, bilateral shoulder flexion, and shoulder abduction. (*Id.*) During this session, she received soft tissue mobilization and joint mobilization, after which she felt "much better." (Tr. 1382.)

18

Jarrett visited Dr. Pai on June 11, 2015, reporting she had hurt her back falling on stairs. (Tr. 1171.)  She also described tingling down her arm and pain in her right wrist.  (*Id*.)  On examination, Jarrett had tenderness over her right wrist.  (Tr. 1172.)  Dr. Pai ordered a nerve conduction study and recommended Jarrett wear an ACE wrap.  (*Id*.)

On June 16, 2015, Jarrett returned to Dr. Sivaraman and denied any acute flares since her last visit.  (Tr. 1187.)  She described an episode of blurred vision and numbness in her right arm, which had resolved.  (*Id*.)  On examination, Jarrett displayed no active joint swelling or synovitis in her hands, wrists, elbows, shoulders, knees, or ankles.  (Tr. 1190.)  She had tenderness over her right shoulder and a trigger finger in her right thumb.  (*Id*.)  Dr. Sivaraman injected Jarrett's right thumb with Kenolog and Lidocaine.  (Tr. 1191.)

A June 18, 2015 lumbar spine MRI revealed (1) stable degenerative changes throughout the lumbar spine; (2) disc herniation at levels T11-12, L3-4, L4-5, and L5-S1; and (3) varied degrees of foraminal encroachment, most severe at L5-S1.  (Tr. 1216.)  This MRI was incomplete secondary to Jarrett's anxiety during the testing.  (Tr. 1402.)

Jarrett visited Dr. Blades on June 30, 2015, reporting right thumb and leg pain.  (Tr. 1402.)  On examination, she had tenderness in her right thumb, an antalgic gait, normal posture, and good strength bilaterally, except slightly decreased right dorsiflexion.  (Tr. 1403.)  Dr. Blades referred Jarrett for another MRI, as well a psychiatrist for her anxiety.  (Tr. 1404.)

A July 6, 2015 lumbar MRI revealed (1) grossly stable spondylosis; (2) post-operative changes at L5-S1 and L4-5; and (3) increased enhancement of the intrasacral nerve roots, suggesting chronic arachnoiditis.  (Tr. 1219.)

On July 21, 2015, Jarrett underwent a right-sided median nerve release. (Tr. 1228, 1230.) On September 10, 2015, she underwent a right carpal tunnel and trigger finger release. (Tr. 1288.)

On October 13, 2015, Dr. Pai completed another "Medical Source Statement: Patient's Physical Capacity" form on behalf of Jarrett. (Tr. 1398-1399.) Dr. Pai found the following limitations for Jarrett:

- she can lift and carry 5 pounds both occasionally and frequently;

- she can stand/walk for less than a half hour total during an 8-hour workday;

- she can sit for one hour total in an 8-hour workday and for 20 minutes without interruption;

- she can rarely climb, balance, stoop, crouch, kneel, and crawl;

- she can occasionally reach and perform fine manipulation;

- she can rarely push and pull;

- she can frequently perform gross manipulation;

- she is restricted from heights, moving machinery, temperature extremes, and pulmonary irritants;

- she has been prescribed a brace and TENs unit;

- she requires the ability to alternate positions between sitting, standing, and walking at will;

- she experiences a severe degree of pain, which interferes with her ability to concentrate, remain on-task, and maintain attendance; and

- she does not need to elevate her legs.

(Tr. 1398-1399.)

Jarrett first visited rheumatologist Van Warren, M.D., on October 6, 2015. (Tr. 1354.) She reported pain in her right leg, left knee, and hands. (*Id*.) She described lower back pain radiating down her right leg since a fall in November 2014. (*Id*.) She relayed she had been referred to pain management for possible nerve blocks. (*Id*.) On examination, Jarrett displayed scalp alopecia, mild soft tissue swelling in her left knee, tenderness of the lower back, and mild tenderness in the right shoulder. (Tr. 1358.) Dr. Warren referred Jarrett to a psychiatrist for her depression and anxiety and prescribed her medications. (Tr. 1363.)

On November 16, 2015, Jarrett returned to Dr. Warren, reporting a recent nerve block did not alleviate her right hip pain. (Tr. 1425.) On examination, she had slight soft tissue swelling in her wrist with mild tenderness, "trivial" bilateral knee joint effusions, and tenderness over the right greater trochanter. (*Id*.) Her straight leg raises were negative. (*Id*.) Dr. Warren prescribed a course of steroids. (*Id*.) December 22, 2015 bilateral knee x-rays revealed minimal osteoarthritis. (Tr. 1647, 1648.)

Jarrett visited Dr. Warren again on February 29, 2016, reporting generalized musculoskeletal pain. (Tr. 1643.) She relayed her TENS unit was helpful with her back pain. (*Id*.) On examination, she had tenderness over her lower back and shoulders and pain in her right groin. (*Id*.) She had no joint effusions. (*Id*.)

Jarrett reported radiating lower back pain to Dr. Warren on April 14, 2017. (Tr. 1626.) On examination, Jarrett displayed no joint effusions, mild tenderness in her knees, and 4/5 strength in her right hip and knee. (*Id*.) She had full strength in her left hip and knee. (*Id*.) Dr. Warren administered an intramuscular injection to the right buttock, increased Jarrett's Gabapentin dosage, and referred her to water therapy. (Tr. 1627.) An April 20, 2017 lumbar

spine x-ray revealed moderate discogenic degenerative changes at L5-S1 and no visibly acute process. (Tr. 2003. )

On September 7, 2017, Dr. Pai filled out another "Medical Source Statement: Patient's Physical Capacity" form on behalf of Jarrett. (Tr. 1740-1741.) Dr. Pai found the following limitations for Jarrett:

- she can lift five pounds both occasionally and frequently;

- she can stand/walk for 30 minutes total in an 8-hour workday and 10-15 minutes at a time;

- she needs to alternate between sitting and standing every 15-20 minutes;

- she can rarely climb, balance, and stoop and "almost never" crouch, kneel, and crawl;

- she can occasionally reach and perform fine manipulation;

- she can rarely push, pull, and perform gross manipulation;

- she is restricted from heights, moving machinery, temperature extremes, and pulmonary irritants;

- she has been prescribed a cane, brace, TENS unit, and breathing machine;

- she experiences a severe level of pain; which interferes with her ability to concentrate, remain on task, and maintain attendance;

- she does not need to elevate her legs; and

- she would need 3-4 additional unscheduled breaks during an 8-hour workday.

(*Id.*)

**C.      State Agency Reports**

**1.          Mental Impairments**

On March 24, 2014, Jarrett underwent a psychological consultative examination with psychologist David V. House, Ph.D. (Tr. 775.) She reported three different psychiatric hospitalizations prior to 2005. (Tr. 777.) She "appeared fragile and tearful" during the evaluation. (Tr. 778.) She had adequate eye contact and her speech was understandable. (*Id.*) She described poor sleep, depression, daily crying, and suicidal ideation. (Tr. 778-779.) Jarrett also reported anxiety, panic attacks, and depersonalization. (Tr. 779.)

Based upon this examination, Dr. House diagnosed mood disorder, PTSD, dissociative disorder with depersonalization, cannabis use disorder in reported remission, and personality disorder with borderline features. (Tr. 782.) Dr. House provided the following assessment of Jarrett:

**1. Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

Long and short-term memory appear intact. She should be able to carry out instructions with mild inconsistencies.

**2. Describe the claimant's abilities in limitations maintaining attention and in concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**

Concentration and attention are intact although concentration may be interrupted by tearfulness. She should be able to follow multistep directions.

**3. Describe the claimant's abilities and limitations in responding appropriately to supervision and to cope with co-workers in a work setting.**

She is socially isolated and seems to lack energy to engage in relationships. She also feels somewhat put upon by others and does not want to be around them. However, she was not uncooperative with the examiner if the examiner can be seen as an authority figure.

**4. Describe the claimant's abilities and limitations in responding to work pressures in a work setting.**

23

> Her emotional resources and coping skills appear significantly reduced. She would have a great deal of difficulty dealing with stressors of every day life, especially in a work environment. She would be dysfunctional and disruptive in a work environment and likely would not show up.

(Tr. 782-783.)

On April 5, 2014, state agency psychologist Irma Johnston, Psy.D., reviewed Jarrett's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 166; 169-171.) Dr. Johnston concluded Jarrett had (1) moderate restrictions in her activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 166.) As for her mental RFC, Dr. Johnston opined Jarrett was moderately limited in her abilities to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) maintain socially appropriate behavior and to adhere to the basic standards of neatness and cleanliness; and (9) respond appropriately to changes in the work setting. (Tr. 169-171.) Dr. Johnston found no significant limitations in any other category. (*Id.*) Dr. Johnston explained the basis of her decision as follows:

She appears severely depressed on a consistent basis along with posttraumatic stress disorder and a dissociative disorder. Her emotional resources and coping skills appear significantly reduced. She is a high school graduate with two years of college. She has been drug free for 11 months per her report. She is prescribed psychotropics for her symptoms of anxiety and depression. No history of [inpatient psychological treatment] or periods of decompensation due to stress. See below.

\*\*\*

[Claimant] was tearful on exam and reports daily crying episodes. Depersonalization and [auditory hallucinations] reported. Lives with her four children. The [claimant] is able to perform tasks which do not require more than occasional, superficial interactions with others.

\*\*\*

The [claimant] would do best in a relatively static environment, with few changes.

\*\*\*

No prior filings. Claimant is prescribed three psychotropics and receives sporadic [psychological treatment], last being seen in 10-2013. History of substance abuse but reports abstinence from drugs for 11 months. Claimant is obese and reports several physical problems. Her focus on physical problems would be likely to increase under stress and pressure.

(*Id.*)

On August 20, 2014, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Jarrett's medical records and completed a PRT assessment and Mental RFC assessment. (Tr. 213, 218-219.) Dr. Goldsmith adopted the findings of Dr. Johnston. (*Id.*)

2. **Physical Impairments**

On March 11, 2014, state agency physician Anne Prosperi, D.O., reviewed Jarrett's medical records and completed a Physical RFC Assessment. (Tr. 167-169.) Dr. Prosperi determined Jarrett could lift and carry up to 50 pounds occasionally and 25 pounds frequently;

stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 168.) Dr. Prosperi further limited Jarrett to avoiding concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 168-169.)

On September 11, 2014, state agency physician Leslie Green, M.D., reviewed Jarrett's medical records and completed a Physical RFC assessment. (Tr. 215-217.) Dr. Green concluded Jarrett could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 216.) Dr. Green opined Jarrett could frequently climb ramps and stairs, never climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, and crawl. (*Id.*) Dr. Green concluded Jarrett would need to avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 217.)

**D.     Hearing Testimony**

During the December 9, 2015 hearing, Jarrett testified to the following:

- She has a medical assistant diploma. (Tr. 122.) She worked as a chiropractic assistant for several months. (Tr. 122-123.) She worked as a medical assistant in a doctor's office in 2002 and 2003. (Tr. 124.) She did not return to work as a medical assistant because she was raising four children. (Tr. 126.)

- She has four children, two of whom are adults. (Tr. 128.) She has two minor children, ages 10 and 11. (*Id.*) She has not returned to work because she is trying to "mentally, get myself together." (*Id.*)

- She cannot take pain medications because they make her nauseated. (Tr. 129.) She smokes marijuana in an attempt to decrease her nausea. (Tr. 130.)

- She filed for disability in 2014 because she was having trouble walking, back pain, and her hair was falling out. (Tr. 130.) She was eventually diagnosed with lupus and began to treat with a rheumatologist. (Tr. 131.) She has swelling in

her knees and joint pain. (Tr. 132.) She has taken multiple courses of steroids for her lupus. (Tr. 133.)

- She underwent back surgery in 2012. (Tr. 131.) She continues to have back pain. (*Id.*)

- She had surgery on her left shoulder in 2014. (Tr. 133-134.) Her left shoulder has improved since this operation but she continues to have a limited range of motion. (*Id.*)

- She had carpal tunnel surgery on her right hand in March 2015. (Tr. 134.) She still has numbness and tingling in her right hand. (Tr. 135.) Her left hand is also numb. (*Id.*)

- She can sit for about twenty minutes, stand for about ten minutes, and walk for five minutes. (Tr. 135.) She can lift 5-6 pounds. (Tr. 136.)

During the November 1, 2017 hearing, Jarrett testified to the following:

- She started seeing a psychologist in 2015. (Tr. 66.) She has panic attacks and fear over a traumatic experience. (Tr. 67.) She does not like being in groups of people. (*Id.*) She has low energy and is easily distracted. (Tr. 68.)

- She sees her psychiatrist once a month. (Tr. 70.) She plans begin counseling in the near future. (Tr. 71.) Her psychiatrist has had to adjust her medications three times. (Tr. 72.)

The ALJ then posed the following hypothetical question:

I want you to assume an individual similar to the claimant in age, education and work history who is limited to light exertion. Who can frequently climb ramps and stairs but should never climb ladders, ropes or scaffolds. Is unlimited in balancing and can frequently stoop, kneel, crouch and crawl. Should avoid concentrated exposure to extreme heat, cold, humidity and respiratory irritants and I should say fingering – well, its carpal tunnel so its forceful pinching and twisting is limited to frequent with the right hand. As for mental, I'm going to say no memory limits, but is limited to routine type work with no production pace or time or quantity. Goal oriented work is acceptable. Is limited to occasional and superficial interaction with the general public, coworkers, and supervisors. Superficial – you know what? I'm going to remove the time limit of occasional. I'm just going to say is limited to superficial interaction with the general public, coworkers, and supervisors. Superficial is being defined as no collaborating, mentoring, directing or directing the work of others. This limitation will also address

any anxiety symptoms because it's difficult working with people in that
regard.

(Tr. 77-78.)

The VE testified the hypothetical individual would not be able to perform Jarrett's past

work. (Tr. 80.) The VE further explained the hypothetical individual would be able to perform

other representative jobs in the economy, such as housekeeper (D.O.T. #323.687-014); food

service worker (D.O.T. #311.677-010); and mail clerk (D.O.T. 209.687-026). (Tr. 81-82.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits,

a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Jarrett was not insured on her alleged disability onset date, January 15, 2014, as her date last insured ("DLI.") was on September 30, 2011. (Tr. 18-19.) Because Jarrett must establish a continuous twelve month period of disability commencing between her alleged onset date and DLI, in order to be entitled to POD and DIB, she is precluded from an entitlement to Title II benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.    The claimant has not engaged in substantial gainful activity since January 15, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: Degenerative Disc Disease, Status Post Lumbar Discectomy; Lupus; Fibromyalgia; Asthma/COPD; Obesity; Acromioclavicular Arthrosis/Bursitis of the Left Shoulder; Carpal Tunnel Syndrome and DeQuervains Tenosynovitis, Status-Post Right Carpal Tunnel Release and Trigger Release; Depression, PTSD (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; She is unlimited in balancing, and can frequently stoop, kneel, crouch and crawl; She should avoid concentrated exposure to extreme heat, cold, humidity and respiratory irritants; Forceful pinching and twisting are limited to frequent with the right hand; She has no memory limits, but is limited to routine type work with no production pace for time or quantity; Goal oriented work is acceptable; She is limited to occasional and superficial interaction with the public; She is limited to superficial interaction with coworkers and supervisors, with no time limit on her superficial interactions with coworkers and supervisors; Superficial is defined to mean no collaborating, mentoring or directing the work of others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on January **, 1972 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-45.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.   Treating Source Opinions

In her first assignment of error, Jarrett argues the ALJ erred in not assigning great weight to the opinions of her treating sources, Drs. Pai and Brandstetter.  (Doc. No. 14 at 17, 20.) She asserts the ALJ "failed to give good reasons for" assigning Dr. Pai's multiple opinions[4] limited weight.  (*Id*. at 18.)  Jarrett contends Dr. Pai's opinions were "detailed, and they specified the impairments, symptoms and medical findings causing [her] limitations."  (*Id*. at 18.)  With respect to Dr. Brandstetter's opinion, Jarrett argues the ALJ's reasoning was "not supported by the evidence" and the ALJ "failed to draw a logical bridge between her conclusion and the evidence."  (*Id.* at 20.)  Jarrett asserts Dr. Brandstetter's opinion is supported by her treatment notes and the other medical evidence contained in the record.  (*Id.* at 21-22.)

---

[4]     The Court notes Jarrett only makes arguments regarding Dr. Pai's opinions on her physical capacity and limitations.  (Doc. No. 14 at 17-20.)  Jarrett does not advance any arguments regarding Dr. Pai's opinions on her mental capacity and limitations.

The Commissioner maintains the ALJ properly considered the opinions of Drs. Pai and Brandstetter. (Doc. No. 16 at 8, 10.) With respect to Dr. Pai's opinions, the Commissioner asserts the ALJ "provided extensive good reasons for" rejecting these opinions. (*Id*. at 8.) The Commissioner further argues the ALJ, when evaluating Dr. Brandstetter's opinion, properly "focused on the consistency" between her opinion and the medical record as a whole. (*Id*. at 10.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

---

[5]  Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[6]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler,* 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581

F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the

treating physician instead submits an opinion on an issue reserved to the Commissioner—such

as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of

vocational factors— [the ALJ] decision need only 'explain the consideration given to the

treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir.

2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir.

2014).

### *Dr. Pai*

The ALJ weighed the opinion evidence from Dr. Pai as follows:

> The undersigned has also given limited weight to the multiple physical
> assessments provided by Dr. Pai.  In the first of these, completed in May
> 2014, Dr. Pai opined that the claimant cannot even perform sedentary
> work, opining that the claimant cannot lift and carry more than five
> pounds; can only stand and walk for a total of one hour in a workday and
> sit for a total of only six hours in a workday for no more than forty-five
> minutes at a time; can only occasionally climb and rarely perform other
> postural, can perform only occasional pushing, pulling and gross
> manipulation, with only frequent reaching and fine manipulation, would
> need to shift between sitting, standing and walking at will, and would
> require additional breaks of thirty minutes in addition to customary breaks.
> (Exhibit 9F).  Dr. Pai provided a similar assessment in February 2015, in
> which he opined that the claimant is even more limited with respect to her
> ability to perform certain activities, opining, for example, that the claimant
> can only occasionally perform fine manipulation and only rarely push and
> pull, that the claimant can stand or walk for less than a half hour in total
> during a workday, and that the claimant's pain would interfere with her
> concentration, attendance and ability to stay on task.  (Exhibit 19F).
> Likewise, Dr. Pai provided similar assessments in October 2015 and
> September 2017, in which he again opined that the claimant's symptoms
> would preclude her from performing the tasks required of even sedentary
> level work.  (Exhibit 33F; Exhibit 50F).

As noted above, Dr. Pai is a physician, and has been involved in treating the claimant throughout the past several years, serving as her primary care provider. However, the undersigned notes that in these assessments, Dr. Pai merely identified the claimant's impairments and symptoms, with few references to any objective exam findings or other objective medical evidence to support his opinions. Additionally, the undersigned finds his assessments are overly restrictive in light of the medical and other evidence of record summarized above. Again, as discussed above, following a visit with her neurosurgeon, Dr. Blades, in January 2013, the claimant's treatment records document no further follow up by her until nearly a year later, document no further follow up by her on a referral for acupuncture given to her in 2014, and document no further follow up by her with her orthopedic specialist following her 2015 right carpal tunnel release and left shoulder surgeries. Similarly, as noted above, the claimant's treatment records document no further follow up by her with Dr. Warren following a visit in August 2016 until April 2017, and document no further follow up with Dr. Warren after that visit. Additionally, as noted above, the claimant has continued to smoke cigarettes despite her asthma, and has continued to smoke marijuana despite being advised to stop this in May 2014 by doctors who attributed her nausea and vomiting to her marijuana use. Further, as noted above, during visits with Dr. Blades subsequent to her 2012 back surgery, records show that the claimant was repeatedly observed to exhibit normal or good strength in her upper and lower extremities.

Additionally, as noted above, during visits in 2014 and 2015, Dr. Sivaraman fairly consistently observed the claimant to appear in no acute distress with no focal neurological deficits, active joint swelling, erythema or synovitis, and while the claimant was noted in July and August to exhibit diminished strength and range of motion in her left shoulder, records show that she was observed to exhibit improved range of motion in her left shoulder by September 2014, with only mildly decreased strength in her left shoulder. Similarly, as noted above, during a physical therapy evaluation in April 2015, the claimant was noted to exhibit nearly normal range of motion in her left shoulder and cervical spine, with otherwise normal range of motion in her upper extremities, and only mildly decreased strength in her shoulders and upper extremities.

Additionally, as noted above, during a physical therapy evaluation in April 2016, the claimant was noted to exhibit diminished range of motion with an abnormal posture, but was observed to exhibit only mildly decreased strength in her lower extremities, and demonstrated improved lower extremity strength and lumbar spine range of motion during more recent visits. Moreover, as noted above, while the claimant at times has been observed to exhibit an abnormal gait, records show that she has, at other

37

times, been observed to exhibit a normal gait. In light of the foregoing, as well as the evidence discussed above concerning the claimant's daily activities, the undersigned finds Dr. Pai's assessments to seem overly restrictive, and finds Dr. Green's assessment above to seem more consistent with the record as a whole. For these reasons, the undersigned has given little weight to Dr. Pai's opinions concerning the claimant's physical abilities.

(Tr. 39-40.)

The Court finds the ALJ did not err in assigning less than controlling weight to Dr. Pai's opinions. In assigning "little weight" to Dr. Pai's conclusions, the ALJ addressed the consistency of the opinion with the record, finding the opinions conflicted the treatment notes, particularly the objective findings upon examination. (Tr. 39.) The ALJ provided detailed examples of this inconsistency, noting the normal exam findings following Jarrett's 2012 back surgery, the improved range of motion in her left shoulder, and the various normal to near-normal findings made during various physical therapy appointments. (Tr. 39-40.) The ALJ also observed Jarrett's various gaps in treatment, as well as her lack of follow up following her carpal tunnel and shoulder operations. (Tr. 39.)

In addition to his inconsistency with the treatment notes, the ALJ further found Dr. Pai's opinions were "overly restrictive" when compared to Jarrett's daily activities. (Tr. 40.) Earlier in the decision, the ALJ provided a comprehensive discussion of Jarrett's activities of daily living, including Jarrett's self-report of being able to prepare simple meals, perform household chores, and care for two young children. (Tr. 36.) The ALJ's discussion of the consistency between Dr. Pai's opinions and the record as a whole are a valid consideration under 20 CFR § 404.1527(c)(2). *See Leeman v. Comm'r of Soc. Sec.*, 449 Fed. Appx. 496, 497 (6th Cir. Dec. 6,

2011) ("ALJs may discount treating-physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes.")

The ALJ also addressed the supportability of Dr. Pai's opinions, another factor to be considered under 20 CFR § 404.1527(c)(2). Indeed, the ALJ determined that while Dr. Pai's opinions identified Jarrrett's impairments and symptoms, they made "few references to any objective exam findings or other objective medical evidence to support his opinions." (Tr. 39.) Jarrett argues this characterization of Dr. Pai's opinions is incorrect, arguing the opinions are "detailed" and "specified the impairments, symptoms and medical findings causing [her] limitations." (Doc. No. 14 at 18.)

A review of Dr. Pai's opinions confirm they are all in check box form, with minimal narrative, explanation, or reference to medical findings to explain the assessed limitations. Indeed, the extent of Dr. Pai's "detailed" explanation for the restrictions is a listing of Jarrett's various diagnoses and the fact she suffers from joint pain. (Tr. 822-823; 1083-1084; 1398-1399; 1740-1741.) The Sixth Circuit has discounted "check-box analysis" as "weak evidence at best," particularly when it is not accompanied by any supportive findings or records. *See Shepard v. Comm'r of Soc. Sec.,* 705 Fed App'x 435, 441 (6th Cir. Sept. 26, 2017); *see also Hernandez v. Comm'r of Soc. Sec.,* 644 Fed. App'x 468, 474-475 (6th Cir. Mar. 17, 2016); *Ellars v. Comm'r of Soc. Sec.,* 647 Fed App'x 563, 566 (6th Cir. May 6, 2016)("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . '"). Thus, by noting Dr. Pai provided minimal support for his conclusions, the ALJ provided a "good reason" for discounting the

opinions.  *See Marvin v. Comm'r of Soc. Sec.,* 2018 WL 4214339, *5 (W.D. Mich. Aug. 10,

2018) *report and recommendation adopted by* 2018 WL 4208682 (W.D. Mich. Sept. 4, 2018);

*Skaggs v. Berryhill*, 2018 WL 4219194, *4 (W.D. Ky Sept. 5, 2018); *Laporte v. Comm'r of Soc.*

*Sec.*, 2016 WL 5349072, *7 (W.D. Mich. Sept. 26, 2016)("ALJs are not bound by conclusory

statements of doctors, particularly when they appear on 'check-box forms' and are unsupported

by explanations citing detailed objective criteria and documentation.").

Moreover, substantial evidence[7] supports the ALJ's finding Dr. Pai's opinions were

entitled to little weight.  In January 2013, Jarrett began to treat with Dr. Sivaraman for her lupus

and chronic joint pain.  (Tr. 735.)  At that time, she had diffuse synovitis in her hands and right

wrist, but her hips, knees, and ankles were normal, without swelling, effusion, or synovitis.  (Tr.

736.)  By January 2014, Jarrett reported "overall improvement" in her lupus symptoms.  (Tr.

708.)  She also indicated her fibromyalgia had improved with medication.  (*Id.*)  On examination,

she had no active joint swelling or synovitis.  (Tr. 711.)  Jarrett again had no active joint swelling

or synovitis in April and May 2014.  (Tr. 889, 875.)  A May 2014 lumbar MRI indicated her

spine was "stable to improved" since her 2012 back operation.  (Tr. 963.)

In July 2014, Jarrett had a limited range of motion in her left shoulder, but the remainder

of her joints appeared normal.  (Tr. 867.)  She underwent a course of occupational therapy in

August and September 2014, which yielded improvements in her left shoulder range of motion

and strength.  (Tr. 610, 1147.)  In March 2015, Jarrett underwent a left shoulder operation.  (Tr.

---

[7]     Jarrett summarily asserts "substantial evidence supports Dr. Pai's functional
assessments."  (Doc. No. 14 at 19.)  However, Jarrett does not direct this Court's
attention to exactly which pieces of evidence support Dr. Pai's highly restrictive
limitations and provides no real analysis or explanation to support this argument.

1126.)  Following this operation, Jarrett did not appear to have any further treatment for her left shoulder complaints.

Jarrett continued to report joint and back pain from 2015 – 2017.  (Tr. 1171, 1187, 1402, 1354, 1643, 1627.)  However, Jarrett often had no active joint swelling, synovitis, or joint effusions.  (Tr. 1190, 1403, 1643, 1626.)  She did have some tissue swelling in October and November 2015, but Dr. Warren characterized this swelling as "mild" and "slight."  (Tr. 1419, 1425.)  In November 2015, her straight leg raises were negative.  (Tr. 1425.)  In April 2017, she had slightly decreased strength in her right lower extremity, but full strength in the left.  (Tr. 1626.)  These treatment notes and objective findings support the ALJ's conclusion that while Jarrett had significant physical restrictions, the limitations found by Dr. Pai were "overly restrictive."  (Tr. 22, 39.)

Accordingly, the Court finds the ALJ met the burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Pai's opinions.  This portion of Jarrett's first assignment of error, therefore, is without merit and does not provide a basis for remand.

### Dr. Brandstetter

The ALJ weighed the opinion from Dr. Brandstetter as follows:

The undersigned has also given limited weight to a similar assessment prepared by Dr. Brandstetter in September 2017, in which Dr. Brandstetter opined that the claimant's impairments cause extreme limitation of her ability to sustain an ordinary routine and regular attendance at work, and manage her psychologically based symptoms, caused marked limitations of her ability to cooperate with others, handle conflicts with others, keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness, work at an appropriate or consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, and work a full day without needing more than the allotted number or length of rest periods, and cause moderate limitations of her ability to ask for help when needed, state her own point of view, initiate or

sustain conversation, understand and respond to social cutes, respond to requests, suggestions, criticism, correction and challenges, change activities or work settings without being disruptive, work close to or with others without interrupting or distracting them, respond to demands, adapt to changes, and set realistic goals.

. . .Additionally, as noted above, Dr. Brandstetter has treated the claimant since December 2015, albeit with some significant gaps in the claimant's follow up . . . Additionally, the undersigned finds these opinions seem grossly overly restrictive in light of the relevant medical evidence concerning the claimant's mental impairments discussed above. In fact, as noted above, the claimant's treatment records document no efforts by her to seek outpatient psychiatric treatment from a psychiatrist, psychologist or other mental health specialist in 2014 or 2015 prior to her initial visit with Dr. Brandstetter in December 2015. Additionally, as discussed above, the claimant's treatment notes reflect significant gaps in her follow up with Dr. Brandstetter. Further, as noted above, while records appear to indicate that the claimant "briefly" met with a therapist in 2016, the claimant's treatment records otherwise document no follow up by her with a psychologist or psychotherapist for additional outpatient mental health treatment during the past two years. Moreover, as discussed above, the claimant's mental status examinations have, overall, been relatively benign. For example, as noted above, when she examined the claimant in 2014 and 2015, Dr. Blades observed her to seem alert and cooperative, with normal attention span and concentration, and intact cognition. Similarly, as noted above, when he examined her in 2015, Dr. Pai observed her to seem anxious and depressed, but repeated[ly] noted that her performance on a detailed mini-mental status examination, include adage and clock-face drawing, was normal. Additionally, as noted above, when he examined her in 2014, Dr. House noted the claimant to seem subdued in manner, and wrote that she appeared fragile and tearful, noting that the claimant became tearful when providing her social and family history, and that this sometimes interrupted their discussion. However, as noted above, Dr. House did not observe her to seem uncooperative, and observed her to exhibit adequate grooming and hygiene, with adequate eye contact, understandable speech, no apparent looseness of associations or tangentiality, and no apparent delusions, paranoia, evasiveness or suspiciousness. Further, as noted above, Dr. House observed the claimant to exhibit intact, memory, attention, and concentration, with fair pace, noting that the claimant was persistent and tried to complete all tasks administered, was able to perform serial seven subtractions and serial threes, was able to recall five digits forward and three digits backward, was able to add, subtract and multiply, and was able to recall three of three objects immediately and after a five minute delay. Moreover, as noted

above, records show that Dr. Brandstetter has consistently observed the claimant to seem alert and cooperative, with fair eye contact, a linear thought process with no looseness of associations, fair insight and judgment, and intact attention and memory. In light of the foregoing, as well as the evidence discussed above concerning the claimant's daily activities, the undersigned finds these assessments are overly restrictive. For these reasons, the undersigned has given limited weight to these opinions.

(Tr. 41-42.)

The Court finds the ALJ did not err in assigning less than controlling weight to Dr. Brandstetter's opinion. In assigning "limited weight" to Dr. Brandstetter's opinion, the ALJ addressed the nature and extent of her treatment relationship with Jarrett, as well as the consistency of the opinion with the medical evidence of record. (Tr. 40-42.) The ALJ observed Jarrett had not started treating with Dr. Brandstetter until December 2015, nearly two years after her alleged onset date. (Tr. 41.) In addition, the ALJ noted this treatment relationship had "some significant gaps." (*Id.*)

When evaluating the consistency of the opinion, the ALJ cited directly to the record, noting specifically where Dr. Brandstetter's opinion was inconsistent with the treatment notes. For example, the ALJ noted Jarrett had not had any regular therapy or counseling during the relevant period. (*Id.*) She also observed Jarrett's "mental status examinations have overall, been relatively benign." (*Id.*) The ALJ then cited multiple examinations in which Jarrett displayed normal attention and concentration, had a normal mini-mental status examination, and was able to satisfactorily perform memory testing. (*Id.*) Prior to this discussion, the ALJ provided a detailed review of Dr. Brandstetter's treatment notes, which indicated Jarrett repeatedly failed to follow through with referrals to therapy, had lengthy gaps in her treatment with Dr. Brandstetter, and displayed some improvement with medications. (Tr. 33-35.)

Jarrett asserts the ALJ "failed to draw a logical bridge between her conclusion and the evidence" when rejecting Dr. Brandstetter's opinion. (Doc. No. 14 at 20.) The Court disagrees. The ALJ cited, with specificity, the treatment notes from various treatment providers, including from Dr. Brandstetter herself, which were inconsistent with Dr. Brandstetter's opinion. (Tr. 41.) The ALJ also discussed, at length, the treatment relationship between Dr. Brandstetter and Jarrett, as well as Jarrett's non-compliance with recommendations to seek therapy. (Tr. 33-35, 41.) It is clear why the ALJ found Dr. Brandstetter's extremely restrictive opinion was not entitled to controlling weight.

Moreover, substantial evidence supports the ALJ's finding Dr. Brandstetter's opinion was not entitled to controlling weight. When Jarrett initially began to treat with Dr. Brandsetter, she has passive suicidal ideation. (Tr. 1624.) Dr. Brandstetter increased her medication dosages and referred Jarrett to therapy. (*Id.*) By February 2016, Jarrett's sleep was improved and she no longer had suicidal ideation. (Tr. 1796.) Dr. Brandstetter observed Jarrett appeared calmer, despite being under stress. (*Id.*) On examination, Jarrett made fair eye contact and her attention and memory were intact. (Tr. 1800.)

Jarrett reported increased anxiety and mood symptoms in April 2016. (Tr. 1602.) However, she denied hallucinations or suicidal ideation and her memory and attention were intact. (Tr. 1606.) Dr. Brandstetter again referred her for therapy. (*Id.*) Jarrett's attention and memory continued to be intact in May 2016, June 2016, and July 2016. (Tr. 1597, 1780, 1773.) In July 2016, she admitted she had not seen a therapist, despite Dr. Brandstetter's multiple referrals. (Tr. 1770.)

On September 6, 2016, Dr. Brandstetter again suggested therapy to Jarrett.  (Tr. 1568.)
On examination, her speech was normal, she had no suicidal ideation, no hallucinations, and
intact memory and attention.  (Tr. 1571.)  Dr. Brandstetter observed Jarrett had made some
"limited improvement" in her mood and sleep.  (Tr. 1573.)

Jarrett then did not see Brandstetter for 8 months, despite her allegedly disabling mental
health symptoms.  (Tr. 1561.)  At that time, she rated her symptoms as "moderate."  (*Id*.)  Dr.
Brandstetter again discussed therapy with Jarrett.  (*Id*.)  On examination, she displayed no
suicidal ideation, no hallucinations, with intact attention and memory.  (Tr. 1564.)  Her insight
and judgment were fair.  (*Id*.)  On September 5, 2017, Jarrett returned to Dr. Brandstetter,
reporting increased symptoms.  (Tr. 1742.)  However, she again admitted she had not sought out
any therapy.  (*Id*.)  On examination, Jarrett had no suicidal ideation, no hallucinations, intact
attention and memory, and fair judgment and insight.  (Tr. 1746.)

Although Jarrett cites evidence from the record, including other opinions, which she
believes supports Dr. Brandstetter's conclusions, the findings of an ALJ "are not subject to
reversal merely because there exists in the record substantial evidence to support a different
conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit
has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the
claimant's position, so long as substantial evidence also supports the conclusion reached by the
ALJ."  *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003).  In this case, the ALJ
clearly articulated her reasons for rejecting Dr. Brandstetter's opinion and these reasons are
supported by substantial evidence.

Accordingly, the Court finds the ALJ met the burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Brandstetter's opinion. This portion of Jarrett's first assignment of error, therefore, is without merit and does not provide a basis for remand.

## B.        Credibility

In her second assignment of error, Jarrett argues the "ALJ committed reversible error by failing to properly evaluate" her pain.[8] (Doc. No. 14 at 23.) She asserts the "ALJ selectively evaluated the evidence and erroneously determined that the objective evidence tended to suggest that [her] pain was not as severe and limiting as alleged." (*Id*.) Jarrett contends her "statements are consistent with objective medical evidence and the other evidence." (*Id.* at 24.)

The Commissioner maintains the ALJ properly considered Jarrett's subjective complaints. (Doc. No. 16 at 12.) The Commissioner argues the "ALJ appropriately recounted the contradictory evidence and supported her determination that [Jarrett's] pain was overstated with substantial evidence." (*Id*.) The Commissioner asserts that while Jarrett complains the ALJ "ignored medical evidence from treating sources," she does not "identify specifically what evidence was allegedly ignored." (*Id*.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). However, when a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process

---

[8]        The Court notes Jarrett makes no arguments regarding the ALJ's credibility evaluation of Jarrett's mental or respiratory allegations, focusing only on the evaluation of pain. (*See* Doc. No. 14 at 23-25.)

for evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[9] 2016 WL 1119029 (March 16, 2016). Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 834 (6th Cir. June 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[10] determination of the individual's statements based on the entire case record.

---

[9]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the November 1, 2017 hearing and December 5, 2017 ALJ decision.

[10]     SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029 at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029  (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all

---

character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).

[11]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D.

seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F.

Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Jarrett's statements and testimony regarding her back pain,

lupus, fibromyalgia, left shoulder pain, and numbness and tingling in her hands. (Tr. 23, 24.) She

noted Jarrett's testimony that she can only "stand for ten minutes at a time," "sit for twenty

minutes at a time," and continues "to experience back pain with pain tingling down her leg

despite a 2012 back surgery." (Tr. 23.) The ALJ then provided a discussion of Jarrett's treatment

notes, the diagnostic testing, the objective findings upon examination, and the medical opinion

evidence. (Tr. 24-29, 37-40.) The ALJ determined Jarrett's medically determinable impairments

could reasonably be expected to cause the alleged symptoms. However, the ALJ found her

statements concerning the intensity, persistence, and limiting effective of these symptoms were

not entirely consistent with the objective evidence of record. (Tr. 24.)

The ALJ provided a detailed discussion and comparison of Jarrett's allegations to the

medical evidence:

> In sum, while treatment records show that the claimant has repeatedly
> complained of joint pains, back pain and muscle aches, the medical
> evidence overall tends to suggest that the claimant's physical impairments
> are not as severe or limited as the claimant has alleged. In fact, as noted
> above, the claimant's treatment records tend to show that her impairments
> have responded well to treatment, reflecting repeated reports of
> improvement with her medications and other treatments. For example, as
> noted above, the claimant reported resolution of her back pain during an
> initial follow up visit with Dr. Blades after her 2012 back surgery, with
> improvement in her ability to sit, stand, and walk. Similarly, as noted
> above, the claimant herself testified that she experienced improvement in

---

> Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her
> credibility findings in terms of the factors set forth in the regulations, thereby
> permitting the court to "trace the path of the ALJ's reasoning.")

her left shoulder pain following a surgery in 2015. Additionally, as noted above, in January 2014, records show the claimant reported experiencing overall improvement in her lupus and fibromyalgia symptoms, showing that her lupus was found to be stable by that time, and show the claimant repeatedly reported experiencing decreasing pain following physical therapy sessions in 2014 and 2015. Similarly, as noted above, in 2015, the claimant reported her Cellcept was helping with her fatigue and joint pains and records show the claimant again repeatedly reported experiencing improvement with her physical therapy sessions in 2017. Additionally, as noted above, records show the claimant has repeatedly reported experiencing improvement with use of her TENS unit. In fact, as noted above, the claimant reported that her back pain subsides with use of this device. Further, as noted above, following a visit with her neurosurgeon, Dr. Blades, in January 2013, the claimant's treatment records document no further follow up by her with Dr. Blades until nearly two years later, when she returned to her in December 2014. The foregoing further tends to suggest that the claimant's symptoms have not been as severe, persistent or limiting as she has alleged.

Similarly, as noted above, the claimant's treatment records document no follow up by her on a referral for acupuncture given to her in 2014, and document no further follow up by her with her orthopedic specialist following her right carpal tunnel release and left shoulder surgeries in 2015. Additionally, as noted above, following a visit with Dr. Warren in August 2016, the claimant's treatment records document no further follow up by her with Dr. Warren until a follow up visit in April 2017, and no document no further follow up by her with Dr. Warren or any other rheumatologist after that visit. The undersigned also noted that, consistent with her testimony, treatment records show that the claimant has at times complained of nausea or vomiting, for which she has been treated with Zofran. (See, e.g., Exhibit 11F/7; Exhibit 41F/20; Exhibit 44F/3-5). However, the claimant testified, as records show, that she continues to smoke marijuana (See, e.g., Exhibit 44F/6), despite having been advised to stop this in May 2014 by doctors who attributed these symptoms to cyclical vomiting caused by her marijuana use. (Exhibit 2F/90). The foregoing strongly suggests that these symptoms are not as severe, persistent or limiting as she has alleged. Similarly, records show the claimant has continued to smoke cigarettes, despite having been advised by her endocrinologist to stop, and document no efforts by her to seek cessation assistance in recent years. (Exhibit 41F/11; Exhibit 44F/6; Exhibit 48F/14).

The objective medical evidence discussed above further tends to suggest that the claimant's symptoms are not as severe, persistent or limiting as she has alleged. For example, as discussed above, images of the claimant's

lumbar spine taken following her 2012 back surgery showed improvement in the disc herniations previously seen, and while a recent MRI revealed signs of possible arachnoiditis, as noted above, x-rays of her lumbar spine have revealed only mild and moderate degenerative changes. Similarly, as noted above, imagines of her cervical spine taken in 2014 revealed only mild degenerative changes, and an MRI of her left shoulder taken that year revealed only moderate acromioclavicular joint arthrosis, with only mild degenerative changes in her glenohumeral joint, and no rotator cuff pathology. Further, as noted above, recent x-rays of the claimant's knees revealed only minimal osteoarthritis. Additionally, the undersigned notes that the claimant's obesity and fibromyalgia may, to some extent, explain the apparent discrepancy between her complaints and these imaging studies. However, the objective exam findings discussed above further tend to suggest that her symptoms are not as severe, persistent or limiting as she has alleged. For example, as noted above, during visits with Dr. Blades subsequent to her 2012 back surgery, records show that the claimant was repeatedly observed to exhibit normal or good strength in her upper and lower extremities. Additionally as noted above, during visits in 2014 and 2015, Dr. Sivaraman fairly consistently observed the claimant to appear in no acute distress and noted her to exhibit no focal neurological deficits, with no active joint swelling, erythema or synovitis.

Additionally, as noted above, while the claimant was noted in July and August to exhibit diminished strength and range of motion in her left shoulder, records show that she was observed to exhibit improved range of motion in her left shoulder by September 2014, with only mildly decreased strength in her left shoulder. Similarly, as noted above, during a physical therapy evaluation in April 2015, the claimant was noted to exhibit nearly normal range of motion in her left shoulder and cervical spine, with otherwise normal range of motion in her upper extremities, and only mildly decreased strength in her shoulders and upper extremities. Additionally, as noted above, in November 2015, Dr. Warren noted the claimant to exhibit only slight swelling and mild tenderness in her wrists, with only trivial knee joint effusions, with tenderness in her lower back and shoulders and pain on Patrick's testing, but an otherwise benign examination of her extremities. Similarly, as noted above, in August 2016, Dr. Warren observed her to exhibit only minimal soft tissue thickening in her MCP joints, and in April 2017 observed her to exhibit only mildly decreased strength in her right hip, with otherwise intact lower extremity strength, and no joint effusions. Further, as noted above, Dr. Warren repeatedly noted her to exhibit negative straight leg raises. Additionally, as noted above, during a physical therapy evaluation in April 2016, the claimant was noted to exhibit diminished range of motion with an abnormal posture, but was observed to exhibit only mildly decreased strength in her lower extremities, and demonstrated

51

improved lower extremity strength and lumbar spine range of motion during
more recent visits.  Finally, as noted above, while the claimant has at times
been observed to exhibit an abnormal gait, records show that she has, at
other times, been observed to exhibit a normal gait.  In fact, as noted above,
the claimant's psychiatrist has repeatedly noted her to exhibit a normal gait
and station throughout the past two years.

(Tr. 29-31.)

The Court finds substantial evidence supports the ALJ's credibility determination.  It is

clear the ALJ considered a number of the factors identified in SSR 16-3p in her comprehensive,

detailed, 3-page long evaluation of Jarrett's allegations of pain.  Indeed, the ALJ considered the

location, duration, and frequency of Jarrett's pain and expressly discussed the effectiveness of the

various treatment modalities prescribed to Jarrett to alleviate her pain.  (Tr. 23, 29-31.)  The ALJ,

however, found Jarrett's statements concerning the intensity, persistence, and limiting effects of

his symptoms were "not entirely consistent with the medical evidence" in light of her

noncompliance with treatment recommendations, the objective findings upon examination, the

diagnostic testing, and the effectiveness of her physical therapy and various operations.  (*Id*.)

These reasons are supported by substantial evidence.  Specifically, as the ALJ correctly

noted, numerous treatment records reflect normal physical examination findings, including no

joint swelling, no muscle weakness, no synovitis, no joint effusion, and normal upper and lower

extremity strength.  (Tr. 513, 736, 711, 875, 867, 1121, 1190, 1403, 1626.)  Moreover, as

discussed by the ALJ, Jarrett reported improvement in her lupus and fibromyalgia symptoms with

medication.  Her 2014 MRI documented improvement from her 2012 back surgery and treatment

notes confirm improvement with physical therapy and her TENs unit.  (Tr. 708, 520, 963, 1136,

1140, 1147, 1643.)  Jarrett also has several gaps in treatment, including a lack of follow up after

her carpal tunnel and left shoulder operations.  Indeed, following her September 2015 right carpal

tunnel release, the records document little continued treatment for her carpal tunnel. (Tr. 1288.) In March 2015, she underwent a left shoulder operation, and medical evidence indicates no further treatment for her left shoulder following this operation. (Tr. 1226.) While Jarrett regularly saw a rheumatologist in 2014 for her lupus and fibromyalgia, the records indicate her visits became more sporadic in 2015 and eventually she went nearly a year without any rheumatology visits between 2016 and 2017. Under the circumstances presented, it was reasonable for the ALJ to discount Jarrett's subjective complaints in formulating the RFC.

Jarrett points to physical examination findings contained in the record, which revealed synovitis in the joints, limited rotation in the shoulders, and diffuse myalgias. (Doc. No. 14 at 24.) However, the ALJ acknowledged these abnormal findings in her decision and explained that on many occasions, these findings were mild in nature. (Tr. 28-29, 31.) Jarrett also asserts the diagnostic testing in the record supports her allegations. (Doc. No. 14 at 24.) Similarly, the ALJ also reviewed and specifically discussed this testing and noted how her 2014 MRI revealed improvement following her 2012 surgery and how her lumbar spine x-rays indicated mild to moderate changes. (Tr. 30.)

Finally, Jarrett asserts the ALJ did not "fully consider[] the record" and ignored evidence from a treating physician. (Doc. No. 14 at 25.) Jarrett does not, however, direct this Court's attention to the treating source evidence the ALJ purportedly ignored. Assuming, *arguendo*, the ALJ did fail to discuss pieces of evidence in her decision, it is well-established that an ALJ need not discuss every piece of evidence in the administrative record so long as she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx

661, 665 (6th Cir. 2004); *Collum v. Berryhill*, 2018 WL 3861839 at * 6 (N.D. Ohio Aug. 14, 2018); *Jackson v. Comm'r of Soc. Sec.*, 2016 WL 5523958 at * 10 (N.D. Ohio Sept. 30, 2016) (stating that, "for her decision to stand, an ALJ need not point to every piece of evidence in the record") (citing *Thacker,* 99 Fed. Appx. at 665.)  Moreover, reading the decision as a whole, it is clear the ALJ provided a comprehensive and accurate review of the evidence.  Indeed, the ALJ dedicated five pages to reviewing the medical record evidence and another three pages to evaluating Jarrett's credibility.  (Tr. 24-31.)

In sum, the ALJ considered a number of factors in assessing Jarrett's credibility, including her treatment course, the objective findings upon examination, the effectiveness of her treatment, and the gaps in her treatment.  These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear. Under these circumstances, remand is not required.

Accordingly, the Court finds Jarrett's second assignment of error to be without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


  *s/Jonathan D. Greenberg*
  Jonathan D. Greenberg
  United States Magistrate Judge

Date: August 12, 2019

54